Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
CABLEVISION SYSTEMS CORP., et al., Plaintiffs,
v.
Frank De PALMA, Defendant.
No. CV-87-3528 (JLC).

Jan. 17, 1989.

Lefkowitz & Tasolides by Daniel J. Lefkowitz, Carle Place, N.Y.

Reisch, Simoni, Bythewood, & Gleason by Richard J. Reisch, Garden City, N.Y.

*MEMORANDUM AND ORDER OF JUDGMENT*

JOHN L. CADEN, United States Magistrate.

*1
Plaintiff, Cablevision Systems Corporation, ("Cablevision") seeks compensatory and punitive damages arising from the defendant, Frank DePalma's alleged violation of § 605 of the Federal Communications Act, 47 U.S.C. § 605 Cablevision which provides premium television programming for pay subscribers, commonly known as cable television, alleges that Frank DePalma illegally sold 177 converter/decoders and one decoder designed to circumvent plaintiff's security system by intercepting and descrambling Cablevision's scrambled signals, in violation of 47 U.S.C. § 605. Such illegal decoders allow non-subscribers to receive cable television without payment to plaintiff, or other authorized cable companies.

A bench trial was held before the undersigned without a jury on September 19, 1988. This Memorandum constitutes the undersigned's findings of fact and conclusions of law.

## FACTS

Cablevision provides alternative television programming to subscribers in its franchise areas. Such programming includes sports, movie and other alternative channels. Cablevision provides cable television services to subscribers on Long Island in Nassau County, Western Suffolk County, as well as the Towns of Islip and East Hampton. Cablevision also services parts of Brooklyn, the Bronx, Bergenfield and Bayonne in New Jersey, Westchester, Connecticut, Boston, Ohio and Chicago. (Tr. 23-24).

Cablevision provides a choice of different levels of programming to its subscribers at varying costs, depending on the level chosen. For example, a Long Island subscriber can get the basic service, ("Family Cable") with no premium movie or sports channels for $19.50 per month. (P.Ex. 1). Family Cable consists of approximately 28 channels out of about 40 total channels provided by Cablevision. (Tr. 26). Likewise, a subscriber can obtain varying levels of premium channels in addition to the basic service. Such programming ranges in price from $29.95 to $59.95 which includes all Cablevision programming. (P.Ex. 1). In order to prevent non-subscribers from receiving premium channels, the television signals for those channels are scrambled prior to transmission. (Tr. 31-32). To enable subscribers to receive these channels Cablevision provides them with a box, known as a decoder, which is programmed to unscramble the channels paid for. (Tr. 38).

Mr. DePalma was first implicated in this action in February, 1984 when United States Marshals seized the business records of D.D.D. Company ("DDD") which at the time was located on Long Island. From 1982 through 1984 DDD was in the business of selling and distributing decoders and converters. (Tr. 6). Included in the records seized were eleven invoices which document the sales of 177 converter/decoders and one decoder by DDD to Mr. DePalma between May 18, 1983 and July 27, 1983, at a total cost of $19,143.15. (P.Ex. 2-12). According to Klara Shoupe, a partner in DDD, DDD did not operate a licensed cable company, nor were they authorized by a licensed cable company to perform any cable services. (Tr. 13). Indeed, the Shoupes, under the auspices of DDD and other companies, have been previously adjudged by Judge Altimari in this District as "one of the largest--if not the largest--distributors of unauthorized or 'bootleg' descramblers on Long Island." *Cablevision Systems Development Co. v. Annasonic Electronic Supply,* No. CV-83-5159, slip op. at 7 (E.D.N.Y. February 10, 1984).

*2
Both Mrs. Shoupe and Stan Sparks, Director of Engineering at Cablevision, testified that converters, which are legally sold in electronic stores such as Radio Shack, provide extended tuning capabilities which allows a television to receive channels beyond channel 13. Some converters can also be used to change the channels by remote control without a remote television set. They cannot, however, decode a scrambled cable television signal. (Tr. 13-14, 16-17, 37). Decoders, on the other hand, are not sold legally "over the counter". (Tr. 39). Decoders, which can be built into converters, give the converters the additional capability of descrambling pay cable television channels. (Tr. 37). Converters with built-in decoders cost at least twice as much as legal converters. (Tr. 39-40).

Mrs. Shoupe further testified that in order for a converter/decoder to have descrambling capabilities, the decoder must be "processed" to descramble scrambled signals. The invoices seized from DDD show that, over a two month

period Mr. DePalma purchased 113 unprocessed converter/decoders, one unprocessed decoder and 64 processed converter/decoders. (P.Ex. 2-12). As for the unprocessed converter/decoders, Mr. Sparks testified that it only takes minimal technical knowledge to enable a person to process a converter/decoder to allow it to descramble scrambled signals. (Tr. 50-51). As for the one plain decoder, Mr. Sparks testified that a user could purchase a plain converter, and combine it with the decoder, thus enabling it to descramble plaintiff's signals. (Tr. 45). A plain decoder has none of the legal capabilities of a converter described above. (Tr. 45). All the converter/decoders as well as the decoder purchased by Mr. DePalma are Cablevision compatible. (Tr. 46-47).

In addition to the invoices and the testimony of Mrs. Shoupe and Mr. Sparks, Cablevision introduced the transcript of Mr. DePalma's deposition taken as a non-party witness in an action by Cablevision against the Shoupes and numerous other parties. (P.Ex. 13). At that deposition, taken after the invoices showing the sales of decoders to Mr. DePalma were seized, Cablevision attempted to elicit information concerning Mr. DePalma's involvement in the purchase and sale of illegal decoders. On the advice of counsel, however, Mr. DePalma invoked the Fifth Amendment in response to every question relevant to this litigation, and also refused to produce documents called for by the subpoena. For example, the following questions were asked, and the following answers given:

Q. Is your primary business or occupation the sale and distribution of converters, decoders and descramblers that can be used to defeat the plaintiffs and that is Cablevision Systems Development Company signal in the Nassau and Suffolk County areas?

A. I refuse to answer on the ground it might tend to incriminate me.
* * *
Q. Do you know Stanley Shoupe or an individual by the name of Beeler Stanley Shoupe?
*3
  A. I refuse to answer on the ground it might tend to incriminate me.
    Q. Are you, in fact, an agent of Beeler Stanley Shoupe or his wife Klara Shoupe?
    A. I refuse to.

(P.Ex. 13, pp. 7-8).

In addition, Mr. DePalma was asked about his business card, which was marked as an exhibit at that deposition and made a part of plaintiff's exhibit 13 at this trial. The card states: "Frank DePalma, Expert Repairs On All Cable Boxes & Descramblers." (P.Ex. 13). When asked about whether this was his card or whether it accurately represented the business he was in, Mr. DePalma again refused to answer. (P.Ex. 13, pp. 11-12). According to Mr.

Sparks, all cable companies, including Cablevision, provide a free converter/decoder to all subscribers of Cable Television. They also provide free repair service for descramblers and converters provided by the cable companies to their subscribers. (Tr. 53-54).

Mr. DePalma was not deposed as a party in this action, although not because of any failure on the part of the plaintiff. In a letter to defendant's counsel in the Spring of 1988, counsel for defendant made it clear that he expected Mr. DePalma to sit for a deposition on March 14, 1988 if he did not intend to assert his Fifth Amendment privilege. Plaintiff's counsel never received a response to this inquiry.
In addition, Mr. DePalma did not attend the trial of this action or proffer any other evidence in his defense. The undersigned made it abundantly clear to Mr. DePalma's counsel at the trial that if he chose not to testify, it would be assumed that Mr. DePalma would again refuse to answer questions put to him and that adverse inferences may be drawn against him as a result of his refusal to testify. The undersigned granted a four-day continuance to allow Mr. DePalma to appear. (Tr. 79, 83). Despite this warning, Mr. DePalma never appeared.

## DISCUSSION

Mr. DePalma is alleged to have violated 47 U.S.C. § 605 . Section 605 (a) provides in pertinent part:

"No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto."

It is well established that Section 605 (a) includes the theft of cable television

services.   See *Ciminelli v. Cablevision*, 583 F.Supp. 158, 161 (E.D.N.Y.1984); *Cablevision Systems Development Co. v. Annasonic Electronic Supply*, No. CV-83-5159 (E.D.N.Y. February 10, 1984). Indeed, it is equally well established that § 605(a) prohibits the sale or distribution of decoders with the intent that they be used for the unauthorized reception of cable or subscription television programming. *National Subscription Television v. S & H TV*, 644 F.2d 820 (9th Cir.1981); *ON/TV of Chicago v. Julien*, 763 F.2d 839 (7th Cir.1985); *Subscription Television of Greater Washington v. Kaufmann*, 606 F.Supp. 1540, 1544-45 (D.D.C.1985).

*\*4*
The undersigned finds that, without any authorization from Cablevision or otherwise under the law, Mr. DePalma purchased and sold 177 converter/decoders and one decoder capable of receiving Cablevision's scrambled signals with the intent of assisting third persons in receiving such transmissions.

While Cablevision did not introduce direct evidence that the defendant sold or redistributed these boxes, the evidence taken as a whole in light of common experience compels the conclusion that such an activity is the only possible result. When a person buys or imports goods in such large quantities that the overabundance renders the extra goods useless to that person, the only natural conclusion to be drawn is that that person purchased those goods with the intent of selling or distributing them into the marketplace. Mr. DePalma purchased 178 converter/decoders over a two month period at a total cost of $19,143.15 from an adjudged cable pirate. There is no other explanation consistent with common experience other than that Mr. DePalma purchased the converter/decoders with the intent of selling or distributing them, and that consistent with that intent he in fact sold the boxes. Absent evidence to the contrary, to assume that Mr. DePalma purchased 178 decoders in two months for personal use borders on the absurd.

Likewise, it is clear that these converter/decoders were sold with the intent of assisting third person's in intercepting unauthorized cable television programming and that they were in fact capable of intercepting and decoding Cablevision's scrambled signals. As Mr. Sparks testified, a converter in combination with a decoder costs at least twice as much as a legal converter which can be purchased at any electronics store. The price paid by Mr. DePalma was within the range of prices for new combination converter/decoders. (Tr. 47). As Mr. Sparks further testified, there is no need for a cable subscriber to purchase his or her own decoder or converter/decoder since all cable companies provide free decoders and repair for all subscribers. The only logical assumption is that those persons who purchased the converter/decoders from Mr. DePalma at twice the price charged for a plain converter, purchased them for their decoding capabilities. As for the one plain decoder, there is no legal use to which it could be put.

Out of the 178 converter/decoders (including the one plain decoder) purchased by Mr. DePalma, 64 of them were processed and required no additional work to enable them to descramble Cablevision's signal. Of the remaining 114 unprocessed converter/decoders purchased, as Mr. Sparks testified, it only takes a few minutes and a minimum amount of technical knowledge to process these decoders. The fact that Mr. DePalma held himself out to be an "expert" in repairs of cable boxes and descramblers, and his refusal to answer relevant questions at his deposition concerning his business card is nothing short of an admission that he had the minimum technical knowledge necessary to process them. In light of Mr. DePalma's refusal to answer relevant questions at his deposition, or otherwise make himself available to testify, the undersigned finds that the defendant sold processed converter/decoders capable of defeating Cablevision's signal in Nassau and Suffolk County, and that he in fact sold these converter/decoders in Cablevision's franchise area.

*5
The "Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."   *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976). *See also Brinks, Inc. v. City of New York,* 717 F.2d 700 (2d Cir.1983); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509 (8th Cir.), *cert. denied,* 469 U.S. 1072 (1984). Defendant, in its post-trial memorandum contends that an adverse inference from silence can only be drawn if the failure to testify "was in response to probative evidence offered against them. Baxter, supra at 318. Defendant contends that since no probative evidence was offered against Mr. DePalma at his deposition, or at trial, the court may not draw adverse inferences from Mr. DePalma's refusal to testify. However, a closer reading of *Baxter* shows that this language was clearly not intended to so limit the ability of triers of fact to draw adverse inferences. Indeed, the Court in *Baxter* goes on to state that " 'failure to contest an *assertion* ... is considered evidence of acquiecence ... if it would have been natural under the circumstances to object to the assertion in question.' " *Baxter, supra* at 319, *quoting U.S. v. Hale,* 422 U.S. 171, 176 (1975) (emphasis added). Other language in *Baxter* leads to the same conclusion: "in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause." *Id.* It is clear that the questions posed to Mr. DePalma at his deposition were of an accusatory nature and that it would have been natural for Mr. DePalma to refute those accusations had they been true. This likewise holds true for Mr. DePalma's failure to testify at trial.

Moreover, the questions asked of Mr. DePalma are probative on essential issues in this case, which go to the core of Cablevision's claim, namely, whether the defendant sold or distributed cable boxes capable of descrambling Cablevision's signal to third parties in Cablevision's franchise area. By invoking his Fifth Amendment rights the defendant has cut off the accepted routes of civil discovery. *RSO Records, Inc. v. Peri,* 596 F.Supp. 849, 857 (S.D.N.Y.1984). To not draw adverse inferences from Mr. DePalma's voluntary refusal to answer relevant questions at his deposition, or to produce relevant documents, as well as his failure to testify or make himself available to testify at trial, would effectively bar Cablevision from presenting vital proof in support of its claims since most of the information necessary for the plaintiff's case is in the hands of Mr. DePalma. *Id.; Brinks,* 717 F.2d at 1142. Indeed, as the Supreme Court has noted, the Fifth Amendment "has little to do with a fair trial and derogates rather than improves the chances for accurate decisions." *Baxter,* 425 U.S. at 319.

## *DAMAGES*

Plaintiff has elected statutory damages pursuant to § 605(d)(3)(C)(II). Section 605(d)(3)(C), which was enacted in 1984 after the violations herein

occurred, provides that the aggrieved party may elect either actual damages or statutory damages for each violation "in a sum of not less than $250 or more than $10,000, as the court considers just." Section 605(d)(3) also provides that the court may, in its discretion, award punitive damages of not more than $50,000 as well as full costs and attorneys' fees.

*6
Factors to be taken into account in determining what damages are "just" include "the pecuniary loss sustained by the victim as a result of the offense, the financial resources of the defendant, ... the financial needs and earning
ability of the defendant .... as well as the burden that a damage award would impose on the defendant relative to the burden alternative relief would impose." *Cablevision Systems Development Co. v. Cohen,* CV-84-1155, slip op. at 4-5 (E.D.N.Y. May 20, 1988) (interpreting an identical provision in 47 U.S.C. § 553).

Neither the plaintiff nor the defendant have put in any evidence concerning Mr. DePalma's financial resources or his ability to pay a judgment. However, based on the nature of the violations and the obvious financial harm to the plaintiff from the sale of the illegal decoders resulting in the loss of Cablevision subscribers, the undersigned finds that an award of $1,000 for each of the 178 violations, plus costs and attorneys' fees is just compensation to the plaintiff. The undersigned finds, however, that punitive damages are not warranted in this case.

Defendant argues that Cablevision is not entitled to retroactive application of § 605(d) which provides for statutory damages. Prior to the inclusion of the specific damages provisions in § 605 courts routinely awarded damages for violations of § 605. See *Cablevision v. Annasonic Electronic Supply,* CV-83-5159, slip op. at 15, 17 (E.D.N.Y. October 22, 1984). Indeed, in *Annasosnic,* the court awarded damages based on "the amount of estimated revenues Cablevision has lost and will continue to lose from the unauthorized use of such descramblers." *Id.* at 17. After estimating the number of
decoders sold in Cablevision's franchise area, the court in *Annasonic* estimated these damages by calculating the lost revenue per month based on Cablevision's rates at the time for each violation over a period of five years, the useful life of the decoders at that time. *Id.* at 12-14. Were the undersigned inclined to apply the same method utilized in *Annasonic,* over the ten-year life span of most of these decoders (Tr. 44-46), the damages awarded would be far greater. Thus, far from being injured by this retroactive application, defendant may actually benefit from the undersigned's award of statutory damages.

## CONCLUSION

For the reasons set forth above, the undersigned finds that plaintiff has been damaged in the amount of $1,000 per violation for a total of 178 violations. Accordingly, the Clerk is directed to enter judgment in favor of the plaintiff in the sum of $178,000, plus costs and interest. The undersigned will consider at a later

date an application by Cablevision for the award of attorneys' fees incurred in connection with this action.

SO ORDERED.

END OF DOCUMENT